JOHN PEPIN and SANDRA PEPIN )
)
v. )
)
)
JOHN P. CENTONZE and )
DONNA CENTONZE )

SUPERIOR COURT
WASHINGTON COUNTY
Washington Superior Court
Docket No. S 513-9-01 Wncv

## Findings of Fact and Conclusions of Law

This matter came before the court for a final evidentiary hearing on the merits on November 25 and 26, 2002 and February 14, 2003. Additionally, oral argument was heard on May 29, 2003. Plaintiffs were present and represented by Paul S. Gillies, Esq. Defendants were present and represented by Richard W. Darby, Esq.

In this case, ownership of 33 acres of remote woodland in the Town of Waterbury is disputed between Plaintiffs, the Pepins, and Defendants, the Centonzes. Both parties own land adjacent to the disputed area, and each claims that the disputed 33 acres was conveyed to their predecessor in title, through whom they acquired it. They have each petitioned for a declaration of ownership of the 33 acres. Their respective parcels were in common ownership in 1943, and both parties agree that the determining factor in the case is what was conveyed in a 1943 deed in which Belle Cooley conveyed a portion of land she had inherited from her father: if she conveyed the disputed 33 acres as part of the premises included in the 1943 transfer, then the Centonzes own it as part of their parcel; if she did not, then it was included in the remaining lands she continued to own, which were later conveyed to the Pepins's predecessor in title, in which case the Pepins own it. The Centonzes secondarily assert a claim of ownership based on adverse possession.

### Findings of Fact

Julius Pixley was Belle Cooley's father. He acquired two adjacent farms in Waterbury in the late 1800's: the farm assembled by Hutchins, which Julius Pixley acquired from the Hutchins estate in 1883, and the Woodward farm directly south of it, which he acquired in 1895. During his life he sold off three pieces from the Hutchins estate property, leaving a remaining piece of the Hutchins farm located directly north of the Woodward farm. He did not sell any portion of

1

the Woodward farm. When he died in 1940, his daughter Belle Cooley inherited his remaining holdings, which consisted of the remainder of the Hutchins farm, and the Woodward farm. She disposed of what she inherited in three pieces: in 1943, she sold a portion of what she owned to Callahan; in 1949 she sold a portion west of the Waterbury-Bolton road (unrelated to the parties' dispute) to Holmes; and in 1952, she sold the remainder to Davis. The focus of this case is: what did she sell to Callahan by her deed in 1943? More specifically, did that conveyance include the 33 acres that are now in dispute?

The deed describes the conveyed property as follows:

Being a certain piece of land located on what is known as Woodard Hill in said Waterbury and being what was formerly known as part of the Young farm and the Frink farm so called on Woodard Hill and being part of the land and premises which were conveyed to Julius Pixley during his lifetime by Administrator's Deed of Arthur Ropes, Administrator of the goods, chattels, and estate of Charlotte M. Hutchins, under date of March 26 AD 1895 and recorded in Book 29 at Page 383 of the Waterbury Land Records. A part of said land and premises were conveyed by J.E. Pixley during his lifetime to S. C. Wheeler by Warranty Deed recorded in Book 31 at Page 8 of the Waterbury Land Records and a part of said land and premises were conveyed to O.C. Atwood by Warranty Deed of J.E. Pixley under date of April 22, 1903 and recorded in Book 31 at Page 217 and a party by J.E. Pixley to Charles Smith under date of April 17 1903 and recorded in Book 31 at Page 216 of the Waterbury Land Records. *Meaning and intending hereby to convey* all of the land and premises which were conveyed to Julius E. Pixley by Administrator's deed of Arthur Ropes, Administrator of Charlotte M. Hutchins' Estate with the exception of the following three parcels of land; Parcel conveyed to O. C. Atwood recorded in Book 31 at Page 217, Parcel conveyed to Charles Smith recorded in Book 31 at Page 216 and parcel conveyed to S. C. Wheeler recorded in Book 31 at Page 8. Part of said land and premises are Lease Land and the Warranties herein contained do not apply to that portion known as Lease Land and the same is subject to an annual rental to the Town of Waterbury in the sum of $2.00.
 The parcel of land hereby conveyed is enclosed by fences on all sides and is wood lot and pasture land.
 Said land and premises being part of the land and premises which were decreed to the grantor herein by Decree of Probate Court for the County of Washington in the estate of J.E. Pixley, deceased and recorded in Book 49 at Page 83 of the Waterbury Land Records.
 Reference is hereby made to the above mentioned deeds, all references therein, to the records thereof and to the Waterbury Land Records for a more particular description of the land and premises hereby conveyed.
(Emphasis added.)

2

Both parties acknowledge that the operative language is what follows the language *"meaning and intending hereby to convey. . . ."* To figure out what land parcel was being described by the language that follows that phrase, it is necessary to resort to descriptions in prior deeds, which are specifically incorporated into the description by the terms of the last paragraph quoted above. The trouble is that resort to these descriptions does not produce a crystal-clear answer. Three surveyors testified in the case after having done deed research, and their opinions, derived from the same deed research, were not identical.

The Pepins's position is that because of this lack of clarity, the grantor's intent can best be derived from the language in the deed that is the most specific and concrete physical description as it relates to the property in 1943: "The parcel of land hereby conveyed is enclosed by fences on all sides and is wood lot and pasture land." They urge the court to rely on their evidence, which they contend supports the existence of a fence line separating the part that Cooley undeniably conveyed to Callahan and the disputed parcel. The Centonzes argue that the reference to the property being enclosed by fences is merely supplementary identifying information and not the language of conveyance, and that moreover the surveyor they rely on (Towne) found some evidence of a fence along the line they claim further to the south, so they claim that their interpretation of the conveyance clause is also consistent with indications of a fence on the ground at their asserted location. The Pepins claim that the Centonzes' evidence does not support the existence of a fence because the Centonzes rely solely on the discovery by Towne of only a single 8" strand of barbed wire near a stone pile that was not clearly either a fencepost base or surveyor's stake and stones, which Towne discovered in 1984, 41 years after the deed. The Pepins' evidence consists of a four-strand barbed wire fence on trees with many years of tree growth having embedded the wire into the trees, and a continuous line of such fencing sufficient to create an enclosure in the location they propose, with some blazes along that line that were visible before the trees were logged off. The Pepins assert that this evidence is the strongest evidence of Belle Cooley's intent. Their surveyor, Marsh, also testified that while deed research is inconclusive, he found evidence suggesting that the north line of the Woodward farm is further north than the Centonzes claim, and thus could be where the Pepins' claimed fence line boundary is.

The Centonzes discount the importance of the fence evidence, and urge the court to rely on the descriptions in the deeds in the land records. They offer the testimony of surveyors Towne and Lowe to establish the location of the north boundary of the Woodward farm and south boundary of the Hutchins farm in support of their position that Cooley conveyed to Callahan all that remained of the Hutchins farm, including the 33 acres. They also claim that the deed language concerning school lease land supports their position, as it signifies the transfer to Callahan of school lease land which, their surveyors say, is part of the disputed parcel, and is more significant than fence evidence because it is derived from descriptions in deeds, those deed descriptions having been specifically referenced in the description of the property conveyed, unlike the reference to a fence.

There is no dispute about the chains of title of the respective properties, which are

3

demonstrated in detail in Stipulated Exhibits 1-26 and summarized in Appendix E attached, which is hereby incorporated into these Findings of Fact.[1] The task for the court is to review the descriptions in the various deeds, the opinions of the three surveyors, and all other relevant evidence, including evidence of the physical characteristics of the land at pertinent points in time, in order to determine the intent of Belle Cooley at the time of her 1943 deed to Callahan.

The parcel Callahan acquired from Belle Cooley in 1943 was conveyed to Desnoyers in 1956, who conveyed it to the Centonzes in 1973. There is nothing in the language of either of those deeds that sheds any light on the location of the property boundaries. The remainder parcel that Belle Cooley transferred to Davis in 1952 passed through several conveyances before the Pepins acquired it in 1988. There is one deed in that chain that suggests that the property to the north of it belonged to Atwood, which, if true, would suggest that the Pepins' predecessor's property included the disputed 33 acres. See Exhibit S 17. The language is ambiguous at best and is included in a last and supplementary paragraph of the deed in which ownership on each of the boundaries is identified, whereas the operative description of the property conveyed is contained in the first and second paragraphs of the description section. Thus, this deed evidence is of little probative value. There is some evidence from neighbors and those familiar with the property over the years concerning the ownership of the disputed area between 1943 and 1989, which is the year when the Pepins first questioned the boundary line claimed by the Centonzes, but such evidence is inconclusive. Therefore, the resolution turns on the facts that are derived from the deed descriptions and the physical evidence and what they show about Belle Cooley's intent as grantor in the 1943 deed.

A schematic drawing, attached as Appendix A and hereby incorporated into these Findings of Fact, shows the two acquisitions of Julius Pixley during his lifetime, being the Hutchins and Woodward parcels. With respect to the Hutchins parcel, it also shows the two components of the Hutchins estate property, one of which was the Young farm. The remainder was made up of three parcels assembled by S.C. Hutchins from Pinneo and Farrand. Appendix A shows the status of ownership in Julius Pixley as of 1895.

Another schematic drawing, attached as Appendix B and hereby incorporated into these Findings of Fact, shows the three out-conveyances Pixley made from the Hutchins estate property during his lifetime, and also depicts the remainder of the Hutchins estate property that he continued to own at the time of his death in 1940. The Woodward farm, which stayed intact during his lifetime, is also depicted.[2]

---

[1] A "tree" version is shown on Defendants' Exhibit A.

[2] Appendices A, B, C, and D may be overlaid on each other, and represent the court's findings with respect to the status of and changes to pertinent aspects of relevant properties from 1883 to 1984. They are schematic only and not intended to be to scale or to be fully accurate in all respects. For example, the drawings do not accurately depict the details of the southern portion of the Woodward parcel owned by Pixley and Belle Cooley, and now owned by the

4

Another schematic drawing, attached as Appendix C and hereby incorporated into these Findings of Fact, shows the property that Belle Cooley acquired from the estate of her father, Julius Pixley, and which she owned at the time of her 1943 deed to Callahan.

A final schematic drawing, attached as Appendix D and hereby incorporated into these Findings of Fact, shows the outline of the Belle Cooley property at the time of her deed to Callahan in 1943, and the two different boundary lines asserted by the parties to this case, shown as internal dotted lines. The line claimed by the Pepins follows the course J-K-L-E-F-H-I, which they claim outlines the remaining land Belle Cooley owned after the 1943 deed, and the line claimed by the Centonzes follows the course J-I-H-G-F-E, which they claim outlines the boundaries of the lands included in the 1943 conveyance to Callahan. The disputed 33 acres lies between these two lines. Other notations on this drawing depict the location of certain physical characteristics that have been proved, along with the year in which their existence has been proved. Other points are labeled with letters so that locations can be identified for purposes of these Findings of Fact.

## Southern boundary of Hutchins estate property

These drawings demonstrate the court's finding of fact that the southern boundary of the Hutchins estate property that Pixley acquired in 1895 is where surveyors Towne and Lowe testified that it is, and not where surveyor Marsh testified that it is. The court finds the testimony of surveyors Towne and Lowe credible on this point, and the testimony of surveyor Marsh not credible, based on the absence of any evidence of any deed in which the boundary between the Hutchins and Woodward farms was described as an irregular line that departed from original lot lines. When Pixley carved out a portion from the Hutchins estate property to convey to Atwood, it became necessary to create a new boundary line, which had to be described. The description of that line starts from a monument as a point of beginning, and proceeds to describe the course of the irregular line using monuments, distances, and directions. No deed contains a description of an irregular line that would be needed to describe a boundary along the line marked by J-K-L-E on Appendix D.

On the contrary, the Hutchins estate property is simply described in deeds as the "Hutchins farm," and reference is made to prior deed descriptions. The southern line of the "Hutchins farm" is a straight line, as depicted on Defendants' D, a drawing by surveyor Lowe which the court finds credible. In addition, the 1900 deed from Pixley to Wheeler uses the southern boundary of the "Hutchins farm" in a manner that makes clear that at least the western portion of the "south line of the aforesaid Hutchins farm" is a straight line. (The line described extends from A-J on Appendix D.) This evidence supports the Centonzes' position that when Belle Cooley conveyed to Callahan the remainder of the Hutchins estate lands--lands her father had acquired from the Hutchins estate less the three out-conveyances he made during his life--she conveyed to Callahan the land extending to the southern boundary of the former Hutchins farm as shown on Appendices A and B, and thus the conveyance included the 33 acres in dispute.

Pepins.

5

Fence evidence

The Pepins presented evidence from which the court can infer that at some time not long before or after 1967, a tree near point L as shown on Appendix D was blazed. The Pepins also presented evidence of a four-strand wire fence embedded in trees and blazes in some trees along line J-K-L-E as shown on Appendix D. Even if the court makes the inference that J-K-L-E was fenced and blazed in 1967, the court has to further infer that blazes and a fence on the ground in 1967 (a) had been there continuously since 1943, (b) show a boundary fence as of 1943, and (c) were intended to serve as a monument for purposes of describing the land conveyed by Belle Cooley to Callahan. While it is conceivable that (a) and (b) are true, there is not enough evidence for the court to make such findings by a preponderance of the evidence. As to (c), the structure and language of the 1943 deed contradict any inference that the fence was intended to serve as a monument for purposes of conveyancing, as there is no starting point given, and it does not appear in any clause with conveyancing language. Moreover, there is no reference to a "fence" as a boundary in any other deed in either the Pepin or Centonze chain of title.

As to the credibility of (a) and (b), there are also other facts that cast doubt on the likelihood of those propositions being true and accurate. First, Belle Cooley herself, in the 1943 deed, describes that the land she is conveying to Callahan includes both wood lot and pasture land, making it reasonable to infer that a fence might have separated portions of the property for different uses, particularly to keep animals from straying into the woods. In that case, even if there were a fence in 1943 as argued by the Pepins, it could as easily have been an internal fence for animal control as a boundary fence. Second, 24 years passed between 1943 and 1967, which is a long time during which there could have been many changes of use and fencing on the land, so it is not reasonable for the court to infer that what existed in 1967 was identical in 1943. There is evidence from the land records that there was logging in the area in the mid 1940's as well as meadow and pasture land use (Exhibit S 29), and John Farr, Sr. testified that between 1949 and 1960 there was considerable pasturing of cattle, involving a number of "back fences" (not boundary fences), in the area.

Third, the 1942 aerial photo of the property does not reveal any evidence reflecting a boundary along the line the Pepins claim was a fence line. (Neither does it reveal the opposite; it does not tend to make either side's position more or less believable.) Fourth, even if there was a fence along the line claimed by the Pepins, there could also have been a fence along the line marked as J-I on Appendix D; in other words, there could have been an internal fence along J-K-L-E plus a boundary fence along J-I.[3] This possibility is supported by evidence of a fence along the line A-J, which, it is clear, represents a part of the southern line of the Hutchins property. Such a fence could have been a boundary fence that continued along J-I and was in existence as a fence in 1943, but not later, based on subsequent changes in land use. The court is not finding this as fact, but noting that this is a possibility that is as consistent with the evidence as Pepins' proposition, thereby casting doubt on inferences of either (a) or (b) described above as being accurate or showing, by a preponderance of the evidence, the intent of Belle Cooley in 1943.

---

[3]This is consistent with the 8" piece of barbed wire found in 1984 along J-I.

6

Such inferences are problematic to begin with, and do not have sufficient strength to justify reliance on them over the conveyancing language in the 1943 deed.

Finally, while Pepins' evidence shows continuous fencing along J-K-L-E, there is only evidence of a few blazes, and the one that is dated is from around 1967. The credibility of the evidence that there was a whole line of blazes is made a little suspect by the fact that surveyor Marsh inspected the scene in 1995, before the area was logged in 2000, looking for boundary evidence along J-K-L-E, and while he found fencing along that line, he did not note on his 1995 Boundary Recovery Plan (Defendant's I) the existence of any blazes in trees along that line. Even if the blaze evidence is given the broadest implications it can bear, the most the court can infer from this is that someone, and it is unclear who, at some point in approximately 1967 may have been claiming a boundary by blazing.[4] While blazing usually indicates a boundary or claim of a boundary, the blaze evidence is so unrelated in time to the 1943 deed that it is not sufficient to support an inference, by a preponderance of the evidence, that a fence along J-K-L-E was in existence in 1943 and was (along with a stone wall fence along C-D-E) what Belle Cooley was referring to in the 1943 deed.

It is worth noting that the court does not find persuasive surveyor Towne's reliance on the 8" single strand of barbed wire near a pile of stones as an indication of a boundary fence. The court finds the evidence described above that defines the southern boundary of the Hutchins farm, and the evidence described below concerning the location of lease land, as the credible basis for its conclusion that the southern boundary of the land conveyed from Belle Cooley to Callahan was the line shown on Appendix D as A-J-I. In short, the court does not find that evidence introduced by either party as to the location of fencing provides a credible basis to support a factual determination of the location of the southern boundary of the lands conveyed by Belle Cooley to Callahan in 1943.

Lease land

The court finds credible the testimony of surveyors Towne and Lowe on the location of lease land owned by Pixley at the time of his death, and thus by Belle Cooley at the time of her conveyance to Callahan. While the evidence as to the exact location of lease land in that section of Waterbury presents surveyors with difficult challenges, the opinions of Towne and Lowe are consistent with historical information available in the land records as well as descriptions in deeds of many surrounding properties, and also consistent with the content of the 1943 deed. Appendices A, B, and C show the court's conclusion as to the location of lease land on the Hutchins estate property: the Hutchins lot contained 25 acres of school lease land, being the

---

[4]As surveyor Towne testified, and the court finds, "any Tom, Dick, or Harry can do a blaze," and unless such blazes correspond rationally with other evidence of a boundary, it cannot be inferred that they represent the fact of a boundary, especially when there is a 24 year time gap between the deed to which it is attempted to be linked and the date of the blaze, during which time the land was used for both pasture and logging by different persons.

7

northwest quarter of the original school lot of 100 acres.[5] This is consistent with the recitation in Pixley's deed to Atwood as follows: "It is hereby agreed between the Grantor and the Grantee that said annual rent shall be $2.00 per annum being one half of the rent of the whole Hutchins lot." It is also consistent with the recitation in Belle Cooley's 1943 deed to Callahan that a portion of the land conveyed was lease land, and the lease land part was subject to rental of $2.00 to the Town, implying that the conveyance included the rest of the lease land on "the whole Hutchins lot." If Belle Cooley was not intending to convey the 33 acres to Callahan, she would not have specified that a part of the conveyance included lease land. As Appendix D depicts, the only part of the land conveyed to Callahan that would have included the lease land was the 33 acres.

Other evidence

There was other evidence introduced that the court considered, but finds does not have high probative value in deciding the issue of Belle Cooley's intent in the 1943 deed. For example, evidence as to the amount of acreage in the parties' respective parcels was not probative. One deed in the Pepin chain states that the parcel contained 100 acres. Subsequent surveys show that the Pepins' parcel contains 128 acres *without* the disputed 33 acres; it would be 161 with it. The Centonzes understood they were purchasing 70 acres from Desnoyers. The subsequent survey shows that their parcel is 89 acres *with* the 33 acres included, and would be 56 acres without it. The evidence shows that Centonzes' land was first surveyed in 1984, and the Pepins' land was first surveyed in 1989. Representations of acreage prior to these dates therefore appear to have no probative value in determining the intent of Belle Cooley in the 1943 deed.

There was evidence that when the Centonzes purchased their property, John Centonze walked the boundaries with the realtor, and subsequently blazed the lines that he believed marked his boundaries. The court finds that in 1973 when he walked through the woods while investigating the property he was proposing to buy, the route he followed was not along either of the lines now proposed by either party based on land records research and surveyors' work, and has no probative value in determining the boundary line between the parties. There was also evidence that beginning in 1986, he entered the 33 acres into the use value program in conjunction with the remainder of the lands he purchased, and that he maintained it in the land use program under a use management plan thereafter. Evidence was introduced concerning tree species and growth patterns within the 33 acres. The court does not find such evidence probative in determining the intent of Belle Cooley in the 1943 deed.

Based on the foregoing facts, the court finds that in the 1943 deed from Belle Cooley to Callahan, Belle Cooley intended to include in the conveyance all lands to the southern boundary of the Hutchins farm as depicted on Appendices A and B.

---

[5]Appendices A, B, and C also show 25 acres of school lease land on the Woodward farm. The deed from Woodward to Pixley stated that it contained "about 25 acres" of lease land.

8

## Conclusions of Law

The grantor's intent as expressed in the deed instrument is the basis for construing the effect of the deed. *Withington v. Derrick*, 153 Vt. 598 (1990). Based on the findings of fact as to the intent of the grantor Belle Cooley, the court concludes that the 33 acres in dispute were conveyed by her to Callahan in 1943, and pursuant to subsequent conveyances, the Centonzes acquired ownership of the 33 acres when they purchased their property in 1973. The Pepins have no interest in the 33 acres in dispute. Because of this conclusion, the Centonzes' alternative claim of ownership based on adverse possession becomes moot.

## Order

Attorney Darby shall prepare a proposed Judgment suitable for recording in accordance with these Findings and Conclusions. Attorney Gillies shall have five days to file any objection.

Date at Montpelier, Vermont this 24th day of July, 2003.

Hon. Mary Miles Teachout
Presiding Judge

9



Appendix A
Julius Pixley Acquisitions

(Young farm portion)

Hutchins Estate to Pixley 1895

Woodward Farm to Pixley 1883

Lease land

Julius Pixley Outconveyances



Pixley to Smith 4/17/03

Pixley to Atwood 4/22/03

Pixley to Wheeler 5/5/00

Remainder of Hutchins Farm retained by Pixley

Woodward Farm retained by Pixley

Lease land

<u>Appendix C</u>
Belle Cooley Ownership Prior to 1943 Deed



← — Lease land

# Appendix D

Belle Cooley Property in 1943, with physical evidence later found



Centonze (formerly Callahan)

pin (formerly Davis)

Lease land

33 acres

Fencing found in 1984

1967± blaze

8" Barbed wire found 1984

The parties claimed boundary lines are shown as dotted lines:

Pepins claim  J - K - L - E - F - G - H - I

Centonzes claim  J - I - H - G - F - E

STATE OF VERMONT
WASHINGTON COUNTY, SS.

John P. Centonze and Donna Centonze )
)
Plaintiffs )
)
v. )        Washington Superior Court
)        Docket No. 513-9-01 Wncv
John Pepin and Sandra Pepin )
)
Defendants )
)

## STIPULATED EXHIBITS:  DEEDS AND SURVEYS FOR ADMISSION INTO THE RECORD

### John P. and Donna M. Centonze Chain of Title

## Exhibit Nos.

S1.      Warranty Deed to J.P. & D.M. Centonze from E.J. & P. Desnoyers dated May 29, 1973 recorded in Book 74, Page 93-94.

S2.      Warranty Deed to E.J. Desnoyers from W.R. Callahan dated December 8, 1956 recorded in Book 56, Page 233.

S3.      Warranty Deed to W.R. Callahan from B.P. Cooley dated September 27, 1943 recorded in Book 46, Page 577.

S4.      Administrator's Deed to B.P. Cooley from J.E. Pixley Estate dated August 29, 1940 recorded in Book 49, Page 83.

S5.      Warranty Deed to Q.C. Atwood from J.E. Pixley dated April 22, 1903 recorded in Book 31, Page 217.

S6.      Warranty Deed to C. Smith from J.E. Pixley dated April 17, 1903 recorded in Book 31, Page 216.

S7.      Warranty Deed to S.C. Wheeler from J.E. Pixley dated May 5, 1900 recorded in Book 31, Page 8.

S8.      Administrator's Deed to J. Pixley from C. Hutchins Estate dated March 26, 1895 recorded in Book 29, Page 383.

S9.      Quitclaim Deed to C. Hutchins from S.C. Hutchins dated September 16, 1867 recorded in Book 19, Page 78.

S10.    Quitclaim Deed to C. Hutchins from S.C. Hutchins dated March 3, 1862 recorded in Book 16, Page 213.

S11.    Deed to G.W. Hutchins from P.P. Pinneo dated September 20, 1847 recorded in Book 10, Page 625.

S12.    Quitclaim Deed to G.H. Hutchins from B. Farrand dated July 25, 1844 recorded in Book 10, Page 81.

S13.    Deed to S.C. Hutchins from J. Young dated May 2, 1844 recorded in Book 10, Page 61.

S14.    Deed to J. Pinneo from G. Hutchins dated July 23, 1841 recorded in Book 9, Page 307.

## John and Sandra Pepin Chain of Title

S15.    Quitclaim Deed to J.M. Pepin from Barnside Realty Corporation dated April 5, 1988 recorded in Book 109, Page 545.

S16.    Warranty Deed to Barnside Realty Corporation from B. Thurmond dated July 6, 1 1985 recorded in Book 99, Page 78.

S17.    Warranty Deed to G.B. Thurmond from J. Davis dated August 21, 1972 recorded in Book 72, Page 205.

S18.    Warranty Deed to J.T. Davis from I.F. and L.R. Davis dated April 30, 1965 recorded in Book 63, Page 70.

S19.    Warranty Deed to I.F. & L.R. Davis from J.T. Davis dated July 31, 1963 recorded in Book 62, Page 60.

S20.    Corrective Warranty Deed to B.P. Cooley from J.T. Davis dated November 15, 1960 recorded in Book 59, Page 289.

S21.    Warranty Deed to I.F. & L.R. Davis from B.P. Cooley dated May 2, 1952 recorded in Book 53, Page 346.

S22.    Warranty Deed to J. Pixley from D. & M. Woodward dated March 21, 1883 recorded in Book 25, Page 58.

S23.    Quitclaim Deed to D. Woodward from L. Woodward dated January 21, 1879 recorded in Book 23, Page 375.

S24.    Quitclaim Deed to J. Woodward from E. Bunker and G. Huntley dated March 14, 1857 recorded in Book 14, Page 540.

2

S25.     Quitclaim Deed to J. Woodward from G. Randall dated September 14, 1855 recorded in Book 14, Page 5.

S26.     Quitclaim Deed to J. Woodward from D. Richardson dated September 14, 1855 recorded in Book 14, Page 4.

## Additional Deeds

S27.     Survey description by Humphrey Gubtail, Surveyor of Amos Demmon on the undivided land on the Original Right of Jesse Clark, dated June 15, 1804, recorded in Book 3, Page 313.

S28.     Warranty Deed to Eugene and Lucille Holmes from Belle P. Cooley dated May 18, 1949 recorded in Book 50, Page 500.

S29.     Warranty Deed to Rex Callahan from Belle Cooley for timber rights dated August 28, 1944 recorded in Book 50, Page 11.

S30.     Warranty Deed to P. and L. Bertalan from J. and S. Pepin dated September 1, 1999 and recorded in Book 166, Page 61.

S31.     Warranty Deed to Leggett Custom Homes, Inc. from J. and S. Pepin dated July 19, 2001 and recorded in Book 177, Page 475.

## Surveys

S32.     Survey of lands of John P. and Donna M. Centonze, by Glenn R. Towne, dated October, 1984 and recorded in Map Book 2, Page 212 (now Map Slide 311).

S33.     Survey of lands of John Pepin, by Glen R. Towne, dated March 1, 1989 and recorded on Map Slide 437.

S34.     Plat of Survey Showing Portion of Subdivision of lands of John R. Pepin, by Harold Marsh dated April 15, 1999 and recorded in Map Slide 673.

S35.     Plat of Survey Showing Conveyance of Land from John M. and Sandra A. Pepin to Paul Bertalan, Jr. and Lisa Bertalan, by Harold Marsh, dated October 12, 2002 and recorded on Map Slide 752.

By:_____
       Richard W. Darby, Esq.
       Attorney for Plaintiffs

By:_____
       Paul Gillies, Esq.
       Attorney for Defendants